## UNION BANK *v.* SUCCESSION OF WILSON.

The Union Bank of Louisiana was allowed by its charter to charge ten per cent per annum, not only on its stock loans, but on ordinary mortgage loans, after maturity.

APPEAL from the District Court of Ouachita, *R. W. Richardson*, J. *McGuire & Ray*, for plaintiff and appellant. *Garrett*, for defendant.

SPOFFORD. J. The only question in the case is a question of usury.

In 1837, *Ephrain R. Wilson* and wife, obtained a loan of $25,000, from the Union Bank of Louisiana, which they secured by a mortgage in favor of the bank. The next year the form of the instruments which evidenced the debt, was changed, a single bond being substituted for the three notes, which were originally given, but the original mortgage was reserved and the debt was not novated.

It seems to be conceded that this was not a stock loan, but an ordinary mortgage loan, and the question is, what interest had the bank a right to charge, under its charter, both before and after the maturity of the loan.

The defendant contends, that by the 9th Section of the Bank Charter, (Acts. 1832, p. 52,) which provided that no more than seven per cent. per annum, should be taken on any loan or discount, the plaintiffs are barred from claiming any higher rate of interest in this case; and so the District Judge decided.

But the the plaintiffs, appealing from that decision, assert that, by their

charter they were entitled to seven per cent. until the maturity of the loan, and in case of default, on the part of the borrower to make punctual payment at maturity, the debt, by mere operation of law, bore interest, thenceforward, at the rate of ten per cent; they aver that repeated adjustments of this debt have been made upon that basis, and that the plea of usury was interposed for the first time in 1852, by the heirs of the obligors, who contracted the debt in 1837.

The whole matter turns upon the construction which is to be given to the 24th Section of the Bank Charter, (Acts 1832, p. 62.) It declares, "that the mortgages for stock and loans granted by virtue of this act, shall bear ten per cent. interest per annum, after maturity, if not punctually paid."

It is singular that a clause of such importance should have been so obscurely worded as to give rise to interpretations diametrically opposed to each other. In the *Union Bank* v. *Guier*, 2 Ann. 249, it was contended, but without success, that the phrase "loans granted by virtue of this act" applied exclusively to ordinary mortgage loans, and not to stock loans.

Here it is contended that the same phrase was intended to apply exclusively to stock loans, and not to ordinary mortgage loans.

Our perusal of the Charter and of the adjudications under it, has satisfied us that this interpretation is inadmissible.

Ordinary mortgage loans, like this one, out of which this controversy grows, were amongst the loans granted by virtue of the act incorporating the Union Bank. We find no portion of the Charter, which seems to restrict this clause to a narrower meaning; we find the latest decisions have thus interpreted it; we find this interpretation to have been acted upon by the Bank, through a long course of years, with the assent of *E. K. Wilson*, the ancestor of the present defendants; and finally, we find that the reason and policy of the law which created the Bank, sanction the interpretation.

In the case of *Bermudez* v. *Union Bank*, 7 Ann. 65, two out of the three Judges who sat in the case, declared that "the interpretation by which this section is extended to *all loans on mortgage*, is the only one by which effect can be given to every part of it, and that it is most consonant with reason." And again: "We must believe that the first part of the 24th Section applied to stock loans, and that the loans subsequently mentioned, are the ordinary mortgage loans. The two together, constitute the mortgages granted by virtue of the Charter, to which the Section has express reference."

We conclude then, that upon the maturity of the bond for $25,000, and the failure of *Wilson* to pay the first instalment, the mortgage began to bear ten per cent. interest; this was the law of the contract, although not specified in the act of mortgage, for the parties contracted under, and, (as to one of them at least,) only by virtue of the Charter.

And so the parties subsequently interpreted this contract.

In 1842, *Wilson* and wife sold a large part of the mortgaged property to *John T.* and *David Faulk*, reciting the mortgage to the Union Bank.

Shortly afterwards, on the 1st May, 1843, the *Faulks* liquidated the *Wilson* debt with the Bank, at the sum of $32,200, due 15th February, 1844, which they assumed, *continuing the original mortgage to secure the same*, and binding themselves to pay one-fifth, February 15th, 1844, with eight per cent. interest for one year on the balance, and one fifth each successive year, with a like interest on the successive balances, until due; in the act assuming the

debt, the *Faulks* state that the loan and mortgage to *Wilson* and wife amounts to $32,200, including arrearages of interest at the rate of ten per cent. per annum, up to the date of the settlement, and at eight per cent. from that date up to the 15th February thereafter.

Afterwards the property was reconveyed to *E. K. Wilson*, to-wit: on the 16th March, 1845; in the deed there was the following recital: "whereas the said *David* and *John T. Faulk*, assumed for said *Wilson* the payment of a debt to the *Union Bank of Louisiana*, a debt to the New Orleans Canal and Banking Company, and a debt to *A. Ledoux & Co.*, now the said *Wilson*, by these presents, hereby releases the said *David* and *John T. Faulk*, from their obligation to pay said debt or so much thereof as yet remains unpaid, and assumes the payment thereof himself."

This seems to import a ratification of the settlement of his own indebtedness, made between the *Faulks* and the Bank, of which he was fully cognizant; but if not, his reply to the letter of *Fry*, the cashier, in September, 1845, is a full acknowledgment of his obligations. On the 1st of September of that year, *Fry* sent him a letter, in which the whole matter was recapitulated, the assumpsit of the *Faulks*, the re-assumpsit by himself; and a statement of the account and arrearages due in strict conformity with the settlement, was made, and with a new charge of ten per cent. interest, from the maturity of the new installment.

*Wilson* answered on the 13th, acknowledging his great obligations to the board for their indulgence, and promising the speedy payment of a large installment.

The new installments for 1844 and 1845, were then long past due.

Thus we find a ratification by *Wilson*, of a settlement by which ten per cent. interest was charged for past defaults, and further indulgence granted on the basis of a charge of eight per cent. interest to maturity, and ten per cent. again thereafter.

If there was any necessity for a formal putting in default, as each installment fell due (and under the Charter, we have intimated that there was not) the letter of *Wilson*, in answer to the statement furnished by the cashier, is a tacit admission, or waiver of such a formality.

But it is urged that the stipulation for eight per cent. interest with the *Faulks*, when the extension was granted to them, was usurious. As we have found that ten per cent. was then running in favor of the Bank by law, it can hardly be deemed usurious for the creditor to agree to reduce it to eight, provided the balance due should be punctually paid by installments, at certain fixed periods. Besides, the banks were authorized to charge eight per cent. discount upon extensions of loans by the Act of February 5th, 1842, §3, (Acts, p. 44.)

It is also urged that interest was compounded, because on the 1st May, 1843, the sum of $32,200 was fixed upon as the sum which would be due on the succeeding 15th February, in which sum an interest at eight per cent. from the former date was included. But the contract stipulated that one fifth of that sum was to be paid on the 15th February, 1844, which would more than extinguish the eight per cent. interest then due, and interest could properly be charged upon the balance; and so we find in fact that on the 17th February, 1844, the sum of $2500 was paid, it being more than the eight per cent., which accrued between that and the first mentioned date.

Upon due inspection of the Charter of the Bank, the various acts signed by *Wilson* and wife, and the *Faulks*, the correspondence of the parties relative to

their mutual transactions, and the accounts of the Bank as sworn to by their officers, we are satisfied that the defendants are legally liable as charged in the plaintiff's petition.

The bill of exceptions taken by the defendant's counsel does not appear to be well founded.

It is, therefore, ordered that the judgment of the District Court be reversed; and it is ordered, adjudged and decreed, that the Union Bank of Louisiana recover of the defendants herein, the sum of sixteen thousand four hundred and eleven 85–100 dollars, with interest thereon, at the rate of ten per cent. per annum, from the 29th May, 1850, and costs in both Courts; it is further ordered and decreed that the plaintiff's special mortgage upon the land in Monroe and on the Bayou Bartholemew, together with the slaves and their increase, described in the petition, be recognized and enforced, and that the said mortgaged property be seized and sold in due course of law to satisfy this judgment.